UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding in a Criminal Term

Grand Jury Sworn in on November 3, 2006

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO. 05-386 (ESH)** |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | |
| **ANTOINE JONES,** | : | **21 U.S.C. § 846 (Conspiracy to** |
| **LAWRENCE MAYNARD,** | : | **Distribute and Possess with Intent** |
| **KIRK CARTER,** | : | **to Distribute Five Kilograms or** |
| **FRANCISCO JAVIER GONZALEZ-RUAN,** | : | **More of Cocaine and Fifty Grams** |
| **GUADALUPE BARRONE,** | | **or More of Cocaine Base)** |
| **JOSE GARCIA, and** | : | |
| **CARLOS REYNA,** | : | **21 U.S.C. § 853 (Criminal** |
| **Defendants.** | : | **Forfeiture)** |
| | : | |
| | : | **18 U.S.C. § 2 (Aiding and** |
| | : | **Abetting)** |

**INDICTMENT**

The Grand Jury charges that:

**COUNT ONE**

**NARCOTICS CONSPIRACY**

**A.  THE CONSPIRACY**

From at least sometime in 2003, the exact date being unknown to the Grand Jury, up to and

including October 24, 2005, in the District of Columbia, the State of Maryland, the State of Texas,

the State of North Carolina, and elsewhere, the defendants, **ANTOINE JONES (hereinafter**

**"Jones"), LAWRENCE MAYNARD (hereinafter "Maynard"), KIRK CARTER (hereinafter**

**"Carter"), FRANCISCO-JAVIER GONZALEZ-RUAN (hereinafter "Gonzalez-Ruan"),**

**GUADALUPE BARRONE (hereinafter "Barrone"), JOSE GARCIA (hereinafter "Garcia"),**

and **CARLOS REYNA (hereinafter "Reyna"),** did knowingly and willfully combine, conspire, confederate and agree together and with Roel Bermea (hereinafter "Bermea"), Alberto Rolando Carillo-Montelongo (hereinafter "Carillo-Montelongo), Ricardo Sanchez-Gonzalez (hereinafter "Sanchez-Gonzalez"), John Adams (hereinafter "Adams"), Demetris Johnson (hereinafter "Johnson"), Donald Hunter (hereinafter "Hunter"), and other persons both known to the grand jury (hereinafter individually referred to by the terms "unindicted co-conspirator-1," "unindicted co-conspirator-2," "unindicted co-conspirator-3," and "unindicted co-conspirator-4"), and unknown to the grand jury, to unlawfully, knowingly and intentionally distribute and possess with intent to distribute:

a) a mixture and substance containing a detectable amount of cocaine, a schedule II narcotic drug controlled substance, and the amount of said mixture and substance was 5 kilograms or more, in violation of Title 21 United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii);

b) a mixture and substance containing a detectable amount of cocaine base, in the form of "crack," a schedule II narcotic drug controlled substance, and the amount of said substance was 50 grams or more, in violation of Title 21, United State Code, sections 841(a)(1) and 841(b)(1)(A)(iii).

## B. GOALS OF THE CONSPIRACY

It was the principal goal of the conspiracy that, in order to obtain as much money and other things of value as possible, the defendants, and co-conspirators not indicted herein, both known and unknown to the grand jury, acquired, repackaged, stored, processed, sold, and redistributed quantities of cocaine and cocaine base, in the form of crack, in the District of Columbia, the State of Maryland, the State of Texas, the Republic of Mexico, and elsewhere.

C.  **MANNER AND MEANS TO EFFECTUATE THE CONSPIRACY**

_____1.  The members of the conspiracy played various and interchangeable roles based upon the needs of the conspiracy.  **JONES** was the primary supplier of cocaine to members of the organization in the District of Columbia and the State of Maryland, including **CARTER,** Adams, Johnson, Hunter, and others known and unknown to the grand jury.  **MAYNARD** assisted **JONES** in his cocaine sales to these co-conspirators.  **JONES** was supplied with cocaine by various individuals, to whom he referred as "the Mexicans," including **GONZALEZ-RUAN, BARRONE, GARCIA, REYNA,** Bermea, Carillo-Montelongo, Sanchez-Gonzalez, and others unknown to the grand jury.

**JONES's Mexican Suppliers**

2.  On some occasions, **JONES,** and/or **MAYNARD,** traveled out of the area to pick up cocaine, and to deliver cash payment for the cocaine.  On other occasions, individuals traveled to the Washington, D.C., area, to deliver large quantities of cocaine to stash locations where it was given to **JONES**, and to collect money from **JONES** and/or **MAYNARD**.  **GONZALEZ-RUAN, BARRONE, GARCIA,** and others unknown to the grand jury, located in the State of Texas, and the Republic of Mexico, employed other individuals to transport large shipments of cocaine – at times in excess of 200 kilograms – in large trucks from Mexico, through Texas, to the Washington, D.C. area.  Once the cocaine arrived in the D.C. areas, other individuals, such as **REYNA**, Bermea, Carillo-Montelongo, Sanchez-Gonzalez and others,  unloaded it into smaller vehicles and transported it to stash locations for storage and distribution.

3

3.  In furtherance of this business relationship with their Mexican distributors, **JONES** and **MAYNARD** rented houses, apartments, storage units, and other locations in the Washington, D.C., area, where **GONZALEZ-RUAN, BARRONE, GARCIA, REYNA,** Bermea, Carillo-Montelongo, Sanchez-Gonzalez, and others stored their cocaine for as much as a month at a time.  The cocaine distributors also stored in these stash locations large amounts of cash that **JONES** delivered to them in payment for cocaine, which they ultimately transported to Mexico.  Over time, as **JONES** grew tired of renting stash houses for the suppliers, the suppliers themselves rented houses in the Washington, D.C., area, for the same purpose.

4.  From time to time, **GONZALEZ-RUAN, BARRONE, GARCIA, REYNA,** Bermea, Montelongo, Sanchez-Gonzalez, and others visited these stash locations to deliver cocaine and to collect, count, and package the money received from **JONES** in exchange for cocaine.   These individuals then transported the money back to Mexico, via the state of Texas, sometimes in cars and SUVs, and at other times in large trucks similar to those that transported the cocaine up from Mexico, driven by other individuals known and unknown to the grand jury.  These stash locations also served as temporary residences for **GONZALEZ-RUAN, REYNA,** Bermea, Montelongo, Sanchez-Gonzalez, and others.

5.  Beginning in April, 2005,  **REYNA**, Bermea, Carillo-Montelongo, and Sanchez-Gonzalez used a house located at 9508 Potomac Drive, Ft. Washington, Maryland (hereinafter "the Potomac Drive house"), as a location in which they stored cocaine for distribution, including at one time as much as 97 kilograms of powder cocaine.  They also used this residence for storage of cash payments, including as much as $800,000, which they received in exchange for the cocaine.  They also stored cash-packaging equipment in this residence, including plastic shrink-wrapping materials,

a heat-sealing machine, and a money-counting machine. From time to time during this period they also resided in the house.

6. During the course of the conspiracy, **JONES** used a cellular telephone to set up meetings with **REYNA** and Bermea at the Potomac Drive house to drop off cash and collect multiple-kilogram quantities of cocaine from **REYNA**, Bermea, Carillo-Montelongo, and Sanchez-Gonzalez. During this time, **JONES** also spoke with **GARCIA** to discuss the timing of large shipments of cocaine from Mexico, through Texas, and into the Washington, D.C. area.

### JONES's D.C.-Area Customers

7. From some time in at least 2003, as frequently as several times a week, **JONES** collected money from some of his local co-conspirators, including **CARTER**, Adams, Johnson, Hunter, unindicted co-conspirator-1, unindicted co-conspirator-2, unindicted co-conspirator-3, unindicted co-conspirator-4, and others known and unknown to the grand jury. **JONES** then visited a stash house, such as the Potomac Drive house, and met with **REYNA**, Bermea and others known and unknown to the grand jury, to deliver quantities of cash, and pick up multiple-kilogram quantities of cocaine for distribution to these co-conspirators. A short time later, **JONES** and/or **MAYNARD** supplied these co-conspirators with wholesale quantities of cocaine obtained from **REYNA**, Bermea, and others.

8. In terms of payment, **JONES** often "fronted," i.e., supplied on consignment, large quantities of cocaine to some of these co-conspirators. At other times, the co-conspirators paid **JONES** cash for the cocaine in advance, which **JONES** in turn delivered to the suppliers at the stash house in exchange for cocaine. Then **JONES** delivered this cocaine to the co-conspirators later in the day. At still other times, the co-conspirators paid **JONES** for the cocaine at the time he delivered

5

it to them.  The price **JONES** charged per kilogram varied between $20,000, and $23,000.

9.  To set up these meetings, **JONES** communicated with his co-conspirators on his cellular telephone, often several times a day, to arrange meeting times and places.  The physical transfer of cocaine and cash between **JONES** and **CARTER**, Adams, Johnson, Hunter, unindicted co-conspirator-1, unindicted co-conspirator-2, unindicted co-conspirator-3, unindicted co-conspirator-4, and others known and unknown to the grand jury took place at Levels, a night club in the District of Columbia owned and operated by **JONES** and managed by **MAYNARD**; at Sam's Carwash and other commercial establishments along Branch Avenue in Temple Hills, Maryland; at the Prince George's County Sports and Learning Center near FedEx Field in Landover, Maryland; occasionally at their residences in the Washington, D.C. metropolitan area; and at other locations in the D.C. metro area known and unknown to the grand jury.  **JONES** and his co-conspirators used plastic shopping bags, duffel bags, backpacks, and other bags to conceal the cocaine and money they were exchanging.  **MAYNARD** occasionally accompanied **JONES** when he met with various co-conspirators to make deliveries of cocaine and to collect large cash payments.  On other occasions, **MAYNARD** alone made deliveries of cocaine from **JONES** to the co-conspirators, and collected cash payments on behalf of **JONES**.

10.  In addition to **MAYNARD**, **JONES** also employed other individuals, both known and unknown to the grand jury, to assist in the day-to-day operations of his cocaine-trafficking business.  For example, Adams broke down larger amounts of cocaine into smaller packages for **JONES,** or Adams, to deliver to other co-conspirators, including **CARTER,** and **MAYNARD**.  Adams also collected drug payments for **JONES** from time to time, and also stored cocaine for **JONES** at his residence.

11.  When communicating with some of these co-conspirators over the phone, to avoid detection by law enforcement, **JONES** used "code" to avoid reference to drugs, money, or meeting places for the transfer of drugs or payment for the drugs.

12.  These co-conspirators  frequently stored the cocaine they obtained from **JONES** at their residences, and then repackaged the cocaine into smaller quantities, and distributed it either as cocaine hydrochloride or cocaine base, in the form of crack.  At times, some of the co-conspirators redistributed the cocaine in kilogram form.  The total quantity of cocaine **JONES** provided to these co-conspirators during this timeframe was in excess of 500 kilograms.

13.  From at least 2003, the exact date being unknown to the grand jury, up to and including October 24, 2005, **JONES** used his vehicle, a 2001 champagne-colored Jeep Grand Cherokee, MD license # M667480, to store cocaine and cash, which he had secreted in a variety of bags, including plastic shopping bags, duffel bags, and backpacks.  **JONES** also used his Grand Cherokee to transport this cash to his suppliers, **GONZALEZ-RUAN, REYNA**, Bermea and others, and to transport cocaine from **REYNA,** Bermea and others and deliver it to **CARTER,** Adams, Johnson, Hunter, unindicted co-conspirator-1, unindicted co-conspirator-2, unindicted co-conspirator-3, unindicted co-conspirator-4, and other co-conspirators known and unknown to the grand jury**.**

## D.  OVERT ACTS

In furtherance of the conspiracy, and in order to effectuate the objects thereof, the defendants, and co-conspirators not indicted herein, whose identities are known and unknown to the grand jury, in various combinations, directly and indirectly, within the District of Columbia, the state of Maryland, the State of Texas, and elsewhere, committed overt acts including, but not limited to, the following:

**Overt Acts with Suppliers**

1. On November 11, 2003, **JONES** rented 9719 Summit Circle, Apartment 3B, Largo, Maryland for use by **JONES, MAYNARD, GONZALEZ-RUAN, BARRONE**, and others both known and unknown to the grand jury, as a stash location for substantial quantities of cocaine and money.

2. On November 11, 2003, **JONES** provided falsified employment documents in connection with his rental of the apartment located at 9719 Summit Circle, Apartment 3B, Largo, Maryland.

3. In or about February, 2004, **GONZALEZ-RUAN** and others both known and unknown to the grand jury, used 9719 Summit Circle, Apartment 3B, Largo, Maryland, as a temporary residence, as they collected cash payments for cocaine they and others had supplied to **JONES** and **MAYNARD**.

4. On February 7, 2004, **GONZALEZ-RUAN** flew to Baltimore-Washington International Airport from Texas, for the purpose of collecting narcotics proceeds which were being stored in Maryland.

5. On February 8, 2004, in the early morning hours, in a car registered to **BARRONE**, **GONZALEZ-RUAN,** and others unknown to the grand jury, visited **JONES's** apartment, located at 9719 Summit Circle, Apartment 3B, Largo, Maryland, to count and collect these proceeds.

6. On or about February 9, 2004, **GONZALEZ-RUAN** and another co-conspirator whose identity is unknown to the grand jury, abandoned the Summit Circle apartment rented by **JONES** and returned to Texas.

7.  On January 10, 2004, **MAYNARD** rented 8550 Myrtle Avenue, Bowie, Maryland, for use by **MAYNARD, JONES, GONZALEZ-RUAN, BARRONE**, and others known and unknown to the grand jury as a stash location for substantial quantities of cocaine and money.

8.  On January 10, 2004, **MAYNARD** provided falsified employment documents in connection with his rental of the house located at 8550 Myrtle Avenue, Bowie, Maryland.

9.  In or about late February, 2004, **GONZALEZ-RUAN** and others known and unknown to the grand jury, used 8550 Myrtle Avenue, Bowie, Maryland, both as a stash house where they stored drugs and money, and packaged money for shipment back to Mexico, but also as a temporary residence while in the D.C. metro area.

10.  On or about February 23, 2004, **GONZALEZ-RUAN** visited the 8550 Myrtle Avenue, Bowie, Maryland stash house rented by **MAYNARD** for the purpose of collecting narcotics proceeds which were stored there.

11.  On February 28, 2004, in the early morning hours, **GONZALEZ-RUAN** returned to the 8550 Myrtle Avenue, Bowie, Maryland, stash house for the purposes of collecting narcotics proceeds stored there, but upon discovering signs of a break in at that location, fled the house at a high rate of speed.

12.  On November 17, 2003, **JONES** rented a warehouse space located at 400 Hampton Park Boulevard, Capitol Heights, Maryland, for use as a stash location by **JONES, MAYNARD,** and their suppliers.

13.  On November 17, 2003, **JONES** provided falsified employment documents in connection with his rental of the Hampton Park storage facility.

14  On April 5, 2005, **MAYNARD** drove to North Carolina, in a van registered to **JONES** containing in excess of $67,000, in cash hidden in a secret compartment, for the purposes of purchasing cocaine.

15.  On April 20, 2005, **REYNA** and another co-conspirator whose identity is known to the grand jury, rented a house located at 9508 Potomac Drive, Ft. Washington, Maryland, for the purposes of storing substantial quantities of cocaine and money, which were intended for **JONES**, and for use as a temporary residence for **REYNA**, Bermea, Montelongo, and Sanchez-Gonzalez.

16**.** From time to time between April 20, 2005, and October 24, 2005, **BARRONE** visited the Potomac Drive house to check on the supply of cocaine, and on the individuals who were transferring the cocaine to **JONES** – **REYNA**, Bermea, Carillo-Montelongo, and Sanchez-Gonzalez.

### Overt Acts from Wire Interception

17.  On September 2, 2005, at 5:52 p.m., **JONES** arranged to meet with unindicted co-conspirator-3 at Sam's Carwash on Branch Avenue in Temple Hills, Maryland, for the purposes of a drug transaction.

18.  On September 2, 2005, at 5:53 pm, **JONES** and this unindicted co-conspirator agreed to meet up the block at Circuit City in Temple Hills, Maryland, for the purposes of that drug transaction.

19.  On September 2, 2005, at 5:55 p.m., **JONES** and Johnson discussed meeting at either Sam's Carwash or Wendy's on Branch Avenue in Temple Hills, Maryland, for the purposes of a drug transaction.

20.  On September 2, 2005, at 6:31 pm, **JONES** and unindicted co-conspirator-3 met on Branch Avenue for the purposes of a drug transaction.

10

21.  On September 2, 2005, at 7:20 pm, **JONES** and unindicted co-conspirator-1 agreed to meet at the Ford dealership on Branch Avenue in Temple Hills, Maryland for the purposes of a drug transaction.

22.  On September 2, 2005, at approximately 7:30 pm, **JONES** and unindicted co-conspirator-2 met at a gas station near Branch Avenue in Temple Hills, Maryland, for the purposes of a drug transaction.

23.  On September 5, 2005, at 4:44 p.m.,  **JONES** called **MAYNARD** and discussed in coded terms the fact that **MAYNARD** had forgotten to tell **JONES** that he received drug money from unindicted co-conspirator-4 and hid it.

24.  On September 5, 2005, at 4:45 p.m., **JONES** called unindicted co-conspirator-4, and told her that **MAYNARD** had forgotten about it, and arranged to meet unindicted co-conspirator-4 later that day or the following morning for the purposes of a drug transaction.

25.  On September 6, 2005, at 9:58 a.m., **JONES** went to the house of unindicted co-conspirator-4 for the purposes of a drug transaction.

26.  On September 6, 2005, at approximately 12:30 p.m., **JONES** and Hunter met at Sam's Carwash on Branch Avenue in Temple Hills, Maryland, and engaged in a drug transaction.

27.  On September 6, 2005, at 2:08 p.m., **JONES** unindicted co-conspirator-4 discussed in code how much cocaine she needed, "three big VIP tickets."

28.  On September 7, 2005, at 10:24 a.m., **JONES** called Adams and told him in coded terms to give a quantity of cocaine to **MAYNARD** who "knows what to do with it."

11

29. On September 7, 2005, at 10:25 a.m., **JONES** called **MAYNARD** and told him in coded terms that **MAYNARD** should get a quantity of cocaine from Adams and give it to unindicted co-conspirator-4.

30. On September 7, 2005, at 10:26 a.m., **JONES** called  unindicted co-conspirator-4 and told her in coded terms that **MAYNARD** had a quantity of cocaine for her, and that **JONES** would have more cocaine for her – "another VIP" – later that day.

31. On September 7, 2005, at 9:05 p.m., **JONES** called unindicted co-conspirator-4 again, and she told **JONES** in coded terms that she needed less cocaine than she had thought – a "smaller ticket" – and they agreed to meet the next day for the purposes of this cocaine transaction.

32. On September 9, 2005, at 8:21 a.m., **JONES** called **CARTER** and in coded terms – "are you ready for half-time?" – asked whether **CARTER** was ready to conduct a cocaine transaction, and the pair agreed to meet at **CARTER's** place of employment in 20 minutes.

33. On September 9, 2005, at 7:07 p.m., **JONES** called **CARTER** and the pair agreed to meet at Sam's Carwash on Branch Avenue in Temple Hills, Maryland.

34. On September 9, 2005, at 7:40 p.m., after another telephone conversation, **JONES** and **CARTER** met at a Chinese restaurant next door to Sam's Carwash on Branch Avenue in Temple Hills, Maryland, for the purposes of a cocaine transaction.

35. On September 10, 2005, **JONES** changed his cellular telephone number.

36. On September 10, 2005, in a series of eight calls beginning at 2:20 p.m., **JONES** called co-conspirators, including **CARTER** and **MAYNARD**, and gave them his new telephone number.

37. On September 10, 2005, at 5:51 p.m., **JONES** called **CARTER** and the pair agreed to meet at Sam's Carwash for the purposes of a cocaine transaction.

38.  On September 10, 2005, after another telephone conversation, **JONES** and **CARTER** met at the McDonald's restaurant two doors down from Sam's Carwash on Branch Avenue in Temple Hills, Maryland, for the purposes of a cocaine transaction.

39.  On September 15, 2005, at approximately 4:09 p.m., **JONES** called **CARTER** and the pair agreed to meet at Sam's Carwash on Branch Avenue in Temple Hills, Maryland, for the purposes of a cocaine transaction.

40.  On September 15, 2005, at 4:35 p.m., **JONES** and **CARTER** met at Sam's Carwash on Branch Avenue in Temple Hills, Maryland, for the purposes of a cocaine transaction.

41.  On September 15, 2005, at approximately 4:40 p.m., **JONES** and **CARTER** departed Sam's Carwash and proceeded up the block to the parking lot of Circuit City, on Branch Avenue in Temple Hills, Maryland, to continue their discussion of a cocaine transaction.

42.  On September 15, 2005, at 4:43 p.m., **JONES** called unindicted co-conspirator-1, and they agreed to meet at a gas station on Branch Avenue in Temple Hills, Maryland, for the purposes of a cocaine transaction.

43.  On September 18, 2005, at 6:25 p.m., **JONES** called **REYNA** and said that he would arrive at the Potomac Drive house in 10 minutes.

44.  On September 18, 2005, at 8:15 p.m.,  **JONES** and unindicted co-conspirator-3 agreed to meet at the car lot near Branch Avenue in Temple Hills, Maryland, within 10 minutes for the purposes of a cocaine transaction.

45. On September 18, 2005, at 8:15 p.m., **JONES** left a message for unindicted co-conspirator-2 to call him, for the purposes of a cocaine transaction.

46.  On September 18, 2005, at 8:17 p.m., **JONES** called **CARTER** and told **CARTER** to meet him by the circle and the subway, near Branch Avenue in Temple Hills, Maryland.

47.  On September 18, 2005, at 8:19 p.m., unindicted co-conspirator-2 called **JONES** back and they discussed in code quantities of cocaine that the co-conspirator might need – "little tickets" and "big VIPs."

48.  On September 18, 2005, at 8:30 p.m., **JONES** and unindicted co-conspirator-3 met at a lot on Branch Avenue in Temple Hills, Maryland, for the purposes of a cocaine transaction.

49.  On September 18, 2005, at 8:44 p.m., **JONES** called **CARTER** and agreed to wait for him for another 15 minutes, for the purposes of a cocaine transaction.

50.  On September 20, 2005, at 10:45 a.m., **GARCIA** called **JONES** to discuss the timing of **GARCIA's** next big shipment of cocaine to **JONES** in coded terms – "as soon as . . . we get through with this party, we'll take a couple weeks"; by then **JONES** will "have all the studio down and all the music down pat."

51.  On September 26, 2005, at 6:35 p.m., **JONES** called **GARCIA** and told him in coded terms that he was collecting money from his customers in order to be able to purchase the next large quantity of cocaine which **GARCIA** was sending up from Texas.

52.  On September 27, 2005, Bermea arrived at the Potomac Drive house to help in the distribution relationship with **JONES**.

53.  On September 27, 2005, at 11:41 a.m., **CARTER** called **JONES** to arrange a meeting at Levels for the purposes of a drug transaction; **JONES** replied that he would call **MAYNARD** to let him know.

54. On September 27, 2005, at 11:44 a.m., **JONES** called **MAYNARD** and told him in coded terms that unindicted co-conspirator-3 was downstairs and had cocaine money and that **MAYNARD** should hold it for **JONES**.

55. On September 27, 2005, at 11:48 a.m., **JONES** called unindicted co-conspirator-3 and told him that **MAYNARD** was waiting for him at Levels.

56. On September 27, 2005, at 4:28 p.m., **JONES** called **CARTER** to confirm that **CARTER** had come to Levels.

57. On September 27, 2005, at 8:43 p.m., **JONES** called Adams in an effort to collect cocaine proceeds to give to **JONES's** Mexican suppliers, **REYNA, GARCIA, GONZALEZ-RUAN, BARRONE**, Bermea, and others known and unknown to the grand jury.

58. On September 27, 2005, at 8:47 p.m., **JONES** called unindicted co-conspirator-2 in an effort to collect cocaine proceeds to give to **JONES's** Mexican suppliers, **REYNA, GARCIA, GONZALEZ-RUAN, BARRONE**, Bermea, and others known and unknown to the grand jury.

59. On September 27, 2005, at 8:48 p.m., **JONES** called Johnson in an effort to collect cocaine proceeds to give to **JONES's** Mexican suppliers, **REYNA, GARCIA, GONZALEZ-RUAN, BARRONE**, Bermea, and others known and unknown to the grand jury.

60. On September 27, 2005, at 8:54 p.m., **JONES** called **REYNA** to tell him that he would come see **REYNA** at the Potomac Drive house later that evening.

61. On September 27, 2005, at 8:57 p.m., **JONES** called Adams again to inquire about the status of Adams's cocaine sales and money collection, telling Adams that he had to go visit the Potomac Drive house because he "didn't keep [his] word."

62. On September 27, 2005, at 9:25 p.m., **JONES** called unindicted co-conspirator-4 in an effort to collect cocaine proceeds to give to **JONES's** Mexican suppliers, **REYNA, GARCIA, GONZALEZ-RUAN, BARRONE**, Bermea, and others known and unknown to the grand jury, saying "I'm trying to get these people to go."

63. On September 27, 2005, at 9:50 p.m., **JONES** arrived at the Potomac Drive house to deliver cocaine proceeds and to discuss the timing of the next shipment of cocaine, departing the house approximately one hour later.

64. On September 27, 2005, late in the evening, or in the early morning hours of September 28, 2005, **REYNA**, Bermea and others received a shipment of 16 kilograms of cocaine from **GARCIA, BARRONE, GONZALEZ-RUAN**, and others unknown to the grand jury.

65. On September 28, 2005, at 4:58 p.m., **REYNA** called **JONES** and asked whether **JONES** was coming to the Potomac Drive house, to which **JONES** replied that he would come out later on.

66. On September 28, 2005, at 5:28 p.m., **JONES** called unindicted co-conspirator-2 in an effort to collect cocaine proceeds to deliver to **REYNA**, Bermea, and others.

67. On September 28, 2005, at 5:30 p.m., **JONES** told Adams in coded terms – "tell them I need a little help right now" – that he needed to collect cocaine proceeds to deliver to **REYNA**, Bermea, and others.

68. On September 28, 2005, at 5:34 p.m., **JONES** called unindicted co-conspirator-3 in an effort to collect cocaine proceeds to deliver to **REYNA**, Bermea, and others.

69. On September 28, 2005, at 5:35 p.m., **JONES** called unindicted co-conspirator-4 in an effort to collect cocaine proceeds to deliver to **REYNA**, Bermea, and others.

70.  On September 28, 2005, at 5:37 p.m., **JONES** called unindicted co-conspirator-1 in an effort to collect cocaine proceeds to deliver to **REYNA**, Bermea, and others, whom he referred to as "my uncle."

71.  On September 28, 2005, at 5:38 p.m., **JONES** called **CARTER** in an effort to collect cocaine proceeds to deliver to **REYNA**, Bermea, and others, saying "I'm trying to make my rounds so I could, um, take care of something;" **CARTER** was still selling his "tickets."

72.  On September 28, 2005, at 7:02 p.m., **REYNA** again called **JONES** to inquire when **JONES** was coming out to the Potomac Drive house, to which **JONES** replied that he was "trying to take care of something so I can come through there."

73.  On September 28, 2005, at 7:28 p.m., **JONES** called unindicted co-conspirator-2 and told him that he was on his way to that co-conspirator's house.

74.  On September 28, 2005, at 7:31 p.m., **JONES** called Johnson, in an effort to collect cocaine proceeds to deliver to **REYNA**, Bermea, and others.

75.  On September 28, 2005, at 8:12 p.m., **JONES** arrived at the house of unindicted co-conspirator-2 to collect cocaine proceeds to deliver to **REYNA**, Bermea and others, and remained for 20 minutes.

76.  On September 28, 2005, at 8:32 p.m., **JONES** arrived at Adams's house, a few blocks from the house of co-conspirator-2, to collect cocaine proceeds to deliver to **REYNA**, Bermea, and others, and remained for 20 minutes.

77.  On September 28, 2005, at 9:10 p.m., unindicted co-conspirator-1 called **JONES** and they agreed to meet in a few minutes at the CVS on Branch Avenue in Temple Hills, Maryland, a short distance from Adams's house.

78.  On September 28, 2005, at 9:35 p.m., **JONES** arrived at the Potomac Drive house to deliver cocaine proceeds to **REYNA**, Bermea, and others, and to collect more cocaine, departing at 10:15 p.m.

79.  On September 28, 2005, at 10:18 p.m., as he was leaving the Potomac Drive house, **JONES** called unindicted co-conspirator-3 who indicated that he wanted "two."

80.  On October 5, 2005, in a series of coded telephone conversations beginning at 1:10 p.m., **JONES** and Adams discussed a discrepancy in cocaine proceeds that Adams gave to **JONES**, with **JONES** saying that he and **MAYNARD** went over the calculations twice, and that Adams had not given **JONES** enough money for the cocaine Adams had received from **JONES**.

81.  On October 8, 2005, at approximately 11:25 a.m., **JONES** called Bermea, who informed **JONES** that the latest shipment of cocaine had been delayed.

82.  On October 8, 2005, at 12:44 p.m., **JONES** called a co-conspirator whose identity is unknown to the grand jury, and told that person that the cocaine shipment had been delayed – "the rain delayed the party" – but that it would likely be in tomorrow.

83.  On October 8, 2005, at 12:46 p.m., **JONES** called unindicted co-conspirator-3 and told him that he had talked to his "uncle" and that the cocaine shipment had been delayed – "the rain delayed the party."

84.  On October 8, 2005, at 7:38 p.m., **JONES** called unindicted co-conspirator-2 and told him that "they cancelled out for today."

85.  On October 9, 2005, at 11:14 a.m., **JONES** called Bermea, who informed **JONES** that he would call him as soon as the cocaine arrived.

86.  On October 10, 2005, at 9:34 p.m., Bermea called **JONES** and told him that the cocaine would arrive in four hours.

87.  On October 11, 2005, in the early morning hours, a shipment of 10 kilograms of cocaine arrived from the suppliers in Mexico.

88.  On October 11, 2005, at 7:39 a.m., **JONES** called Bermea who informed **JONES** that the cocaine had arrived.

89.  On October 11, 2005, at 7:41 a.m., **JONES** left a message for unindicted co-conspirator-1 to call him.

90.  On October 11, 2005, at 7:46 a.m., **JONES** called Adams in an effort to meet for a cocaine transaction.

91.  On October 11, 2005, at 7:49 a.m., **JONES** called unindicted co-conspirator-2 in an effort to arrange a cocaine transaction.

92. On October 11, 2005, at 7:56 a.m., **JONES** called unindicted co-conspirator-3 and they made plans to meet later for the purposes of a cocaine transaction.

93.  On October 11, 2005, at 7:58 a.m., **JONES** called Johnson and they made plans to meet later for the purposes of a cocaine transaction.

94.  On October 11, 2005, at 8:27 a.m., **JONES** agreed to meet with unindicted co-conspirator-1 at the CVS on Branch Avenue in Temple Hills, Maryland, to engage in a cocaine transaction.

95.  On October 11, 2005, at 9:15 a.m., **JONES** called Bermea again and told him that he would arrive at the Potomac Drive house in approximately 20 minutes.

96.  On October 11, 2005, at approximately 9:45 a.m., **JONES** arrived at the Potomac Drive house, where he dropped off cash, and collected cocaine, and departed at approximately 11:41 a.m.

97.  On October 11, 2005, at 11:54 a.m., **JONES** agreed to meet with Adams at his house, and arrived shortly thereafter, for the purposes of a cocaine transaction.

98.  On October 11, 2005, in the evening, **JONES** met with three different unindicted co-conspirators, whose identities are known to the grand jury, for the purposes of drug transactions.

99.  On October 12, 2005, at 12:36 p.m., Bermea called **JONES** and told him in code that another shipment of cocaine was en route and would arrive the following night – "the girls are coming tomorrow night."

100.  On October 12, 2005, at approximately 12:44 p.m., **JONES** called Adams and told him that the cocaine was coming the following night – "sometime tomorrow."

101.  On October 12, 2005, at approximately 12:47 p.m., **JONES** called an unindicted co-conspirator, whose identity is known to the grand jury, and told him in coded terms that the cocaine was coming the following night – "your uncle is going to talk to me tomorrow."

102.  On October 12, 2005, at approximately 1:40 p.m., **JONES** called unindicted co-conspirator-2 and told him "sometime tomorrow, man."

103.  On October 12, 2005, at approximately 3:05 p.m., **JONES** called unindicted co-conspirator-1 and told him in coded terms that the cocaine would arrive the following day – "tomorrow, your uncle, tomorrow."

104.  On October 12, 2005, at approximately 9:18 p.m., **JONES** told unindicted co-conspirator-3 in coded terms that the cocaine would arrive the following day – "your Uncle was talking to me and he is supposed to be in tomorrow."

20

105.  The next day, on October 13, 2005, at approximately 2:53 p.m., **JONES** told **CARTER** in coded terms that he expected a cocaine shipment that evening – "might be this evening, your cousin was telling me this evening."

106.  On October 13, 2005, at approximately 5:25 p.m., in a coded conversation Bermea told **JONES** that he was going to pick up the cocaine shipment later – "going to meet the girls" – that evening; **JONES** replied that he needed "20 out of the VIP tickets."

107.  On October 13, 2005, late in the evening, 65 kilograms of cocaine, sent by **GONZALEZ-RUAN, BARRONE, GARCIA,** and others unknown to the grand jury, arrived by tractor-trailer into the D.C. area, and Bermea collected them and transported them to the Potomac Drive house.

108.  On October 14, 2005, at approximately 7:03 a.m., **JONES** arrived at the Potomac Drive house to drop off cash and collect cocaine, and remained until 8:16 a.m.

109.  On October 14, 2005, at approximately 8:16 a.m., as he was leaving the Potomac Drive house in possession of a large quantity of cocaine, **JONES** called **CARTER** in an effort to arrange a cocaine transaction.

110.  On October 14, 2005, at 8:17 a.m., **JONES** called unindicted co-conspirator-3 and they agreed to meet by the Circle on Branch Avenue in Temple Hills, Maryland, for the purposes of a cocaine transaction.

111.  On October 14, 2005, at 8:19 a.m., **JONES** called Johnson, and they agreed to meet at the Circle by Branch Avenue in Temple Hills, Maryland, for the purposes of a cocaine transaction.

112.  On October 14, 2005, at 8:21 a.m., **JONES** called unindicted co-conspirator-2 in an effort to arrange a cocaine transaction.

113.  On October 14, 2005, at approximately 9:21 a.m., **JONES** went to Adams's house to drop off cocaine.

114.  On October 14, 2005, at 9:35 a.m., **JONES** called **CARTER** again and told him "whenever you ready."

115.  On October 14, 2005, at approximately 10:23 a.m., **JONES** went to unindicted co-conspirator-2's house for the purposes of a cocaine transaction.

116.  On October 14, 2005, at approximately 10:30, **JONES** met with Johnson at the Circle on Branch Avenue in Temple Hills, Maryland, for the purposes of a cocaine transaction.

117.  On October 14, 2005, at approximately 10:45 a.m., **JONES** met with unindicted co-conspirator-3 for the purposes of a cocaine transaction.

118.  On October 14, 2005, at approximately 10:49 a.m, **JONES** called unindicted co-conspirator-4 and told her that he was "talking to [her] uncle."

119.  On October 14, 2005, at approximately 11:30 a.m., Hunter met with **JONES** at Levels, and gave him $5,750, as advanced payment for a quarter-kilogram of cocaine, and **JONES** promised to call Hunter later that day when he had more cocaine available.

120.  On October 14, 2005, in the early evening, **JONES** met with Bermea at the Potomac Drive house, dropped off cash, and picked up more cocaine.

121.  On October 14, 2005, at approximately 6:45 p.m., **JONES** called **CARTER** and left a message for **CARTER** to give him a call.

122.  On October 14, 2005, at approximately 8:05 p.m., **JONES** and Johnson agreed to meet in 15 minutes "where [they] were at this morning" for the purposes of a drug transaction.

123.  On October 14, 2005, at approximately 8:06 p.m., **JONES** called Adams and told him he needed to pick something up from Adams.

124.  On October 14, 2005, at approximately 8:46 p.m., **JONES** called Hunter and left a message for Hunter to call him.

125.  On October 14, 2005, at approximately 8:48, **JONES** visited unindicted co-conspirator-2's house for the purposes of a cocaine transaction.

126.  On October 15, 2005, at approximately 3:38 p.m., **JONES** met with **CARTER** for the purposes of a cocaine transaction.

127.  On October 17, 2005, at approximately 4:51 p.m., **JONES** spoke with **CARTER** in a coded conversation in which **JONES** told **CARTER** that half-kilograms of cocaine cost $10,500, at which **CARTER** expressed surprise.

128.  On or about Wednesday, October 19, 2005, at approximately 11:13 a.m., **GARCIA** left a coded message for **JONES** that a shipment of cocaine would be arriving on Thursday or Friday – "the DJ is already on the way to your club, they'll getting there by, uh, Thursday or Friday, by Friday."

129.  On Wednesday, October 19, 2005, at approximately 11:15 a.m., **JONES** and **GARCIA** spoke in a coded conversation, and **GARCIA** reiterated that a shipment of cocaine would be arriving on Thursday or Friday.

130.  On October 19, 2005, at approximately 5:19 p.m., **JONES** and Bermea had a conversation in which Bermea stated that he was home, and **JONES** stated that he would call him later.

23

131.  On Thursday, October 20, 2005, at approximately 6:25 p.m., **JONES** visited the Potomac Drive house for approximately one hour and 20 minutes.

132.  Late in the evening on Friday, October 21, 2005, or in the early morning hours of Saturday, October 22, 2005, 80 kilograms of cocaine from **GONZALEZ-RUAN, BARRONE, GARCIA,** and others unknown to the grand jury, arrived in the D.C. area, and Bermea and others transported it to the Potomac Drive house.

133.  On October 23, 2005, at approximately 7:56 p.m., **JONES** spoke with unindicted co-conspirator-2 and stated in a coded reference that he had to make contact with his customers – " goin' to make my rounds now so I can take care of it" – because cocaine was available.

134.  On October 23, 2005, in the evening, **JONES** and unindicted co-conspirator-2  met and that co-conspirator gave **JONES** cash as advanced payment for a quantity of cocaine.

135.  On October 23, 2005, at approximately 8:48 p.m., **JONES** told Adams that he would arrive at Adams's residence in a few minutes.

136.  On October 23, 2005, in the evening, **JONES** met with Adams, who gave **JONES** approximately $20,000, as advanced payment for a kilogram of cocaine.

137.  On October 23, 2005, at approximately 8:08 p.m., **JONES** called **CARTER** and in a coded conversation they agreed to get together that night for the purposes of a cocaine transaction.

138.  On October 23, 2005, at approximately 9:25 p.m., **JONES** and **CARTER** met and **CARTER** gave **JONES** cash as advanced payment for a quantity of cocaine.

139.  On October 23, 2005, at approximately 10:07 p.m., **JONES** told unindicted co-conspirator-3  in a coded conversation that the cocaine shipment had arrived – "out here making my rounds, slim, trying to make my rounds, so I can take care of those contracts for that band" –  and

24

they agreed to meet the following morning.

### Search Warrants

140.  On October 24, 2005, at his home in Waldorf, Maryland, **JONES** was in possession of in excess of $69,000, in cash, which he had recently collected from his customers, and which he was planning to deliver to Bermea as payment for a quantity of cocaine.

141.  On October 24, 2005, at his home in Landover, Maryland, unindicted co-conspirator-1 was in possession of proceeds from drug sales totaling $2,743, approximately 4 grams of crack cocaine, derived from cocaine which he had obtained from **JONES**, and a loaded handgun.

142.  On October 24, 2005, Adams was in possession of approximately 115 grams of cocaine, which he had obtained from **JONES**, along with two handguns and $9,600, in cash, which was proceeds from earlier drug sales.

143.  On October 24, 2005, the Suitland, Maryland house of unindicted co-conspirator-2 contained approximately 130 grams of cocaine, which the co-conspirator had obtained from **JONES**, along with $10,750, in cash, which was proceeds from earlier drug sales, and a digital scale and other drug packaging materials.

144.  On October 24, 2005, at his home in Waldorf, Maryland, Johnson was in possession of approximately one-half kilogram of cocaine, which he had previously obtained from **JONES**, along with $12,545, in cash, and a digital scale and other drug packaging materials.

145. On October 24, 2005, the house at 9508 Potomac Drive, Ft. Washington, Maryland, contained 97 kilograms of cocaine, individually packaged and secreted in several duffel bags, 549 grams of crack cocaine, in excess of $850,000, at least $700,000, of which was packaged in heat-sealed bundles and secreted in duffel bags, heat sealing equipment and wrappers, ledger books and

pay sheets, and several air mattresses, along with Carillo-Montelongo, Sanchez-Gonzalez, and Bermea, who was attempting to exit through an elevated bathroom window in the rear of the house.

146.  On October 25, 2005, **CARTER's** home in Southeast, Washington, D.C. contained drug packaging equipment, including two digital scales, a strainer coated with cocaine residue, and numerous empty ziplock baggies, along with assorted ammunition and shotgun shells.

_____**(Conspiracy to Distribute and Possess With Intent to Distribute Five Kilograms or More of Cocaine and Fifty Grams or More of Cocaine Base,** in violation of Title 21, United States Code, Section 846)

## FORFEITURE ALLEGATION

Upon conviction of the controlled substance offense alleged in Count One of this Indictment, defendant **ANTOINE JONES** shall forfeit to the United States pursuant to 21 U.S.C. § 853, any property constituting, or derived from,  proceeds obtained, directly or indirectly, as a result of the said violation and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the said violation, including but not limited to the following:  MONEY JUDGMENT – a sum of money equal to $1,000,000, in United States currency, representing the amount of proceeds obtained as a result of the offense, Conspiracy to Distribute and Possess with Intent to Distribute Five Kilograms or More of Cocaine, and Fifty Grams or More of Cocaine Base.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to, or deposited with, a third party;

(c)  has been placed beyond the jurisdiction of the court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other

property of said defendant up to the value of the forfeitable property described above.

All in accordance with 21 U.S.C. § 853 and Rule 32.2 of the Federal Rules of Criminal

Procedure.

_____**(Criminal Forfeiture,** pursuant to Title 21, United States Code, Section 853**)**

A TRUE BILL:

FOREPERSON.

Attorney of the United States in
and for the District of Columbia